Dr. Cleophaus S. WHITAKER, Jr., Plaintiff,

v.

BOARD OF HIGHER EDUCATION OF the CITY OF NEW YORK, City University of New York (Brooklyn College), Nathaniel Schmuckler, Individually and in his capacity as Dean of the School of Social Science, Willie F. Page, Individually and in his capacity as a Professor and Chairperson Department of Africana Studies and Political Science at Brooklyn College, Defendants.

No. 77 C 2258.

United States District Court, E. D. New York.

Oct. 17, 1978.

Rothbard, Harris & Oxfeld, Newark, N. J., for plaintiff; Emil Oxfeld, Newark, N. J., of counsel.

Allen G. Schwartz, Corp. Counsel of the City of New York, New York City, for defendants; Judith A. Levitt, Mary P. Bass, Laura B. Simkin, New York City, of counsel.

American Council on Education, Washington, D. C., amicus curiae; Sheldon Elliot Steinbach, of counsel.

United States Dept. of Justice, Drew S. Days, III, Asst. Atty. Gen., Civ. Rights Div., Washington, D. C., amicus curiae; Andrew J. Barrick, Stephen L. Mikochik, U. S. Dept. of Justice, Washington, D. C., of counsel.

Memorandum of Decision and Order

MISHLER, Chief Judge.

Seeking both injunctive and monetary relief, plaintiff, a former professor of African Studies at Brooklyn College, commenced this suit against the College, several members of its faculty and administration, and the Board of Higher Education, charging that the defendants violated 42 U.S.C. §§ 1981 and 1983 and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (section 504). Specifically, the plaintiff claims that the defendants' conduct, which culminated in their decisions to deny him tenure and to prohibit him from using the title "Martin Luther King Distinguished Professor" (MLKDP), violated plaintiff's due process rights. Furthermore, plaintiff, an admitted alcoholic who characterizes his alcoholism as a "handicap," alleges that the defendants' conduct was proscribed by § 504, which prohibits recipients of federal financial assistance from discriminating against "otherwise qualified handicapped individual[s]."

Plaintiff has moved for a preliminary injunction ordering that the defendants treat him as a tenured Brooklyn College faculty member and restraining them from interfering with his use of the title "MLKDP" pending the final on-the-merits determination of the action. Defendants have cross-moved to dismiss the complaint, stressing, in the main, 3 points: (i) that the plaintiff fails to state a claim upon which relief can be granted under sections 1981 or 1983 since the defendants' actions did not affect any cognizable "property" or "liberty" interest entitled to due process protection; (ii) that the court lacks subject-matter jurisdiction over, and that the plaintiff has failed to state a claim under, the Rehabilitation Act since no private right of action exists under section 504; and (iii) that even if a private right of action does exist, the plaintiff should be required to exhaust certain administrative remedies prior to bringing suit. For the reasons stated below, both the plaintiff's and the defendants' motions are in all respects denied.

*BACKGROUND*

As presented in the plaintiff's complaint, the factual background to this action first began to unfold in March 1974, when the plaintiff, then on leave from a position at Princeton University, met with the then Chairman of the College's Department of Africana Studies, Thomas B. Birkenhead, who was then Dean of the College, and two other faculty members. Plaintiff was told that the College was interested in offering him the position of "Martin Luther King Distinguished Professor." At that time, plaintiff was informed that the position would have an initial duration of one year, but that if he were interested it would be converted into a regular tenured appointment. Subsequently, in April 1974, plaintiff accepted a position as "MLKD *Visiting* P," taking an additional year's leave from Princeton. He began employment at Brooklyn College on September 1, 1974, meeting his first class in early October of that year.

Shortly thereafter, plaintiff advised the defendant Willie F. Page, then the Acting Chairperson of the Department of Africana Studies, that he was interested in securing a permanent, tenured position as MLKDP. In response to this request, Page began to solicit information regarding the plaintiff from various institutions of higher learning, and, by a memo to Dean Birkenhead dated November 25, 1974, "formally request[ed] consideration for appointment of [plaintiff] permanently to the Department of Africana Studies as Martin Luther King Professor." In early 1975, Dean Birkenhead and Professor Page advised plaintiff that the necessary steps were being taken to have his permanent appointment confirmed.

Suddenly, however, allegedly because he was also vying for one of a limited number of tenured positions, Professor Page, in the language of the complaint,

> embarked on a campaign of falsely accusing plaintiff of being unfit to teach, and to hold a position of the Martin Luther King Distinguished Professor, and set about a campaign to prevent plaintiff's reappointment to the faculty, and falsely utilized as the grounds and falsely and maliciously represented and communicated to other members of the faculty and of the plaintiff's department that plaintiff was morally derelict, had defaulted on his performance as a teacher because of his alcoholism, had failed to give public lectures to which he had been committed, had manipulated colleagues and other faculty members to cover up his own

delinquencies, and was incompetent as a teacher, unworthy as a person, unreliable as an "uncured" alcoholic, and thoroughly unworthy of reappointment. Complaint, page 6, ¶ 3.

As part of this campaign, Page allegedly wrote a letter to the President of the College, reiterating the charges outlined above. This letter was placed in plaintiff's personnel file.[1] In addition, Page allegedly harassed the plaintiff, destroyed or lost student evaluations which were favorable to the plaintiff, addressed him in obscene terms in front of his colleagues, and pressured those colleagues into voting against his reappointment. In the end, although plaintiff subsequently served several one-year appointments,[2] and only left the faculty in August 1978—after this suit was filed—he was never granted tenure.

Plaintiff's complaint also recites one other set of facts upon which he claims he is entitled to relief. In response to Page's actions, plaintiff attempted to appeal to defendant Nathan Schmuckler, Dean of the School of Social Sciences. Plaintiff contends that defendant Schmuckler refused to see him and actively supported and cooperated with Page in the campaign "to terminate plaintiff's employment." Complaint, page 8, § 3. After a meeting of the Department of Africana Studies where Schmuckler appeared and chastised the Department and the plaintiff, plaintiff published an open letter in the school newspaper protesting Schmuckler's conduct. Shortly there-

---

1. The letter was later removed from the file at the request of plaintiff's attorney.

2. The papers submitted to the court in connection with the motions under consideration reveal the following: In December, 1974, plaintiff was reappointed to a position for the 1975–76 academic year. In the fall of 1975, however, the College's Appointments Committee and Personnel and Budget Committee voted against plaintiff's being reappointed for the 1976–77 academic year. The plaintiff thereupon filed a grievance, his non-reappointment was reversed, and he was reappointed without tenure for the 1976–77 year by the President of the College. Plaintiff presently has a step II grievance pending regarding his claim to tenure. In the fall of 1976 plaintiff was reappointed to a

position for the 1977–78 year. In December, 1977, after the institution of the suit, the College decided not to reappoint the plaintiff for the 1978–79 academic year.

While the basic facts outlined above are uncontested, the precise nature of the positions to which plaintiff was reappointed is in dispute and goes to the merits of his claims. That is, the basic question of whether the plaintiff was, as he alleges, entitled to a tenured position as MLKDP, necessarily requires a review of all the dealings between the plaintiff and the defendants. Of course, at this stage of the litigation, it would be inappropriate to analyze the conflicting affidavits and exhibits and make findings of fact regarding the position or positions plaintiff held at the College.

after, in May 1977, Schmuckler advised the plaintiff that he did not hold the position of MLKDP. In June 1977, plaintiff was informed of essentially the same information by the Executive Assistant to the President of the College who, stating that he was merely reiterating prior directions by the Administration, also directed the plaintiff to cease and desist from using the MLKDP title. Plaintiff claims that he had openly used the title since 1974 without objection by any member of the College's faculty or administration, and that "[t]o suddenly withdraw the use of this title would be tantamount to an acknowledgement of fraudulent professional conduct, and would be most damaging and humiliating to plaintiff's standing in the world of the social sciences and humanitarian scholarship." Complaint, page 10, ¶ 5.

## DISCUSSION.

### I. The Due Process Claim.

The defendants contend that the plaintiff has failed to state a claim under sections 1981 and 1983.[3] We note that the plaintiff's complaint is hardly a model of draftsmanship. We are also not unmindful of this Circuit's admonition that "[o]f all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision." *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2d Cir. 1974). Yet, we must apply the accepted rule that a "complaint should not be dismissed for insufficiency unless it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." 2A Moore's Federal Practice, ¶ 12.08 at 2271–74. Application of this standard warrants, at least at this stage of the litigation, that defendants' motion be denied.

Admittedly, the complaint contains many allegations which are hardly of a constitutional nature, sounding in defamation, and perhaps, breach of contract. Yet, the complaint also alleges that the defendants' actions "were intended to interfere with plaintiff's rightful expectancy, property, and liberty, and were in violation of his constitutional . . . rights." Complaint, page 7, ¶ 5. As we read that statement, in the factual context described in the complaint and outlined above, it reflects a charge that the defendants denied the plaintiff tenure, and prohibited him from using the title MLKDP, without due process of law. While the precise nature of the denial of due process is not specified, the liberal reading of the complaint which is required in determining such a motion reveals that the plaintiff is complaining of having been deprived of his tenure and title on the basis of untrue charges relating to his competency. That is, it appears as if the denial of the due process complained of is the defendants' having taken their adverse action for arbitrary and capricious reasons as a result of a mistaken belief that the plaintiff, who was an alcoholic, was unfit to teach. If plaintiff was deprived of a "property" or "liberty" interest in an arbitrary or capricious manner or for arbitrary or capricious reasons, he has been denied due process. *See Simard v. Board of Educ.,* 473 F.2d 988 (2d Cir. 1973). *See also Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Wieman v. Updegraff,* 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952). *Cf. Jeffries v. Turkey Run Consol. School Dist.,* 492 F.2d 1 (7th Cir. 1974) (Stevens, J.)

In any case, apparently recognizing the essence of plaintiff's constitutional claim, the defendants do not attack his pleadings by arguing that they insufficiently define the nature of the alleged due process deprivation. Rather, defendants ground their motion on the contention that neither the

---

**3.** Defendants in their motion papers also urged that the Section 1983 claim against the Board of Higher Education and the City University be dismissed on the ground that those entities are not "persons" within the meaning of section 1983. Of course, application of the Supreme Court's decision in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) disposes of that contention.

plaintiff's "property" nor "liberty" interests have been affected by their actions and that the plaintiff therefore cannot avail himself of the protections of the due process clause. While the defendants may ultimately prove those points, in this case resolution of those issues implicates factual questions and a judgment on the pleadings is therefore inappropriate.

■ The defendants are of course correct in their assertion that in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that a party must show that a challenged action has deprived him of a constitutionally cognizable "property" or "liberty" interest before the procedural protections of the due process clause are implicated. A similar showing must be made in a case, such as this one appears to be, where a party complains that he has been deprived of a right or interest for arbitrary, irrational reasons, *i. e.,* where he claims that he has been deprived of "substantive" due process. *See, e. g., McGhee v. Draper,* 564 F.2d 902, 912–13 (10th Cir. 1977); *Weathers v. West Yuma County School Dist. R-J-1,* 530 F.2d 1335, 1340–42 (10th Cir. 1976); *Jeffries v. Turkey Run Consol. School Dist., supra. See also Simard v. Board of Educ., supra,* 473 F.2d at 994–95.

Plaintiff's complaint indicates that the "property" rights at issue were his alleged rights to tenure and to the continued use of the title "MLKDP." The defendants, however, turn to *Roth* in an effort to defeat plaintiff's claim. There, in holding that a non-tenured professor could not use the due process clause as a vehicle with which to challenge a university's decision not to renew his employment contract, the Court wrote: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577, 92 S.Ct. at 2709. Focusing on the

fact that the plaintiff in that action, under the terms of his employment contract and under state law, had no "legitimate claim" to reemployment, the Court held that the dismissed teacher had not been deprived of a constitutionally cognizable property right.

The defendants attempt to fit the instant case into the *Roth* mold. In brief, they contend that the plaintiff had not actually been hired in 1974 to fill the seat of MLK Visiting Professor. Rather, they claim that the Board of Higher Education, which is the body that actually enters into employment contracts on behalf of the College, officially employed plaintiff as a full professor without any other special title. Furthermore, while admitting that members of the Department of Africana Studies continued to refer to plaintiff as MLKDP, defendants contend that upon his subsequent yearly reappointments the plaintiff likewise held only the title of full professor. Accordingly, they argue that plaintiff could not have been deprived of a right to a title which he never possessed.[4]

Similarly, defendants also contend that plaintiff has no claim to tenure. They point out that while early tenure is sometimes granted, under established procedures a professor is generally granted tenure only after 5 years of continuous service. Furthermore, while officials of the College may recommend tenure, only the Board of Higher Education may actually confer it. In the instant case, because the plaintiff did not serve for 5 years continuously and because the Board of Higher Education did not at any point agree to grant him tenure, he had no legitimate claim of entitlement to it.

As is seen, defendants bottom their arguments on the official procedures followed by the Board of Higher Education, and the absence of formal agreements between the Board and the plaintiff. However, *Roth's* companion case, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), clearly teaches that the "lack of a contractual or tenure right to reemploy-

4. Alternatively, defendants contend that even if plaintiff had been hired as MLKVP in 1974, "the duration of the appointment was only one year. Thus, any arguable rights he had to the use of the title were extinguished at the end of his first year of service in August, 1975."

ment [does not], taken alone, defeat [a] claim that the nonrenewal of [a] contract violated the . . . Fourteenth Amendment." *Id.* at 596, 92 S.Ct. at 2697. There, in reversing a grant of summary judgment in favor of a university which had discharged a professor who had not been officially granted tenure, the Court recognized that the "absence of . . . an explicit contractual provision may not always foreclose the possibility that a teacher has a 'property' interest in reemployment. . . A teacher . . . who has held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure." *Id.* at 601–02, 92 S.Ct. at 2699–2700. Other courts have followed suit and recognized that while not officially tenured, a party may possess "de facto" tenure. *See, e. g., Gentile v. Wallen,* 562 F.2d 193, 197 n.5 (2d Cir. 1977); *Weathers v. West Yuma County School Board, supra,* 530 F.2d at 1336 (2d Cir. 1973). *See also Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 ("A property interest in employment can, of course, be created by . . . an implied contract").

■ In the instant action, if we take the facts in plaintiff's pleadings as true, the plaintiff has alleged, as did the plaintiff in *Sindermann,* "the existence of . . . understandings . . . fostered by state officials, that may justify his legitimate claim of entitlement," 408 U.S. at 603, 92 S.Ct. at 2700, to tenure and use of the MLKDP title. Moreover, even if we treat this motion to dismiss as one for summary judgment, *see* Rule 12(b)(6), and go beyond the pleadings to the conflicting affidavits regarding the nature of the plaintiff's employment, we are confronted with serious fact questions. Accordingly, because plaintiff should be given an opportunity to prove that under state law, *see Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709; *Sindermann, supra,* 408 U.S. at 602 n.7, 92 S.Ct. at 2700 n.7, he had a property interest in the expectation of tenure and the use of the MLKDP title, a judgment at this time would be inappropriate.

■ Similarly, plaintiff should be given an opportunity to prove that he has been deprived of a "liberty" interest. As this Circuit has stated, *Roth* made clear "that where [an individual's] 'good name, reputation, honor, or integrity is at stake' or 'the State, in declining to re-employ [that individual], imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities,' . . . he may claim a deprivation of 'liberty' under the due process clause of the fourteenth amendment." *Lombard v. Board of Educ.,* 502 F.2d 631, 637 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975), quoting *Board of Regents v. Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. Other Supreme Court decisions have refined the *Roth* formula so that where one claims that official action in connection with an employment decision has resulted in the imposition of a stigma, that action will

> constitute deprivation of a liberty interest, [when] the stigmatizing information [is] both false, *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam), and made public, *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), by the offending governmental entity, *see Paul v. Davis,* 424 U.S. 693, 708–10, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). *Gentile v. Wallen,* 562 F.2d 193, 197 (2d Cir. 1977).

■ In the instant action, defendants submit that plaintiff is in no position to contend that he was "stigmatized." First, they argue that no reason whatsoever was given to explain his being denied tenure since no official action was ever taken regarding his claim to tenure. Accordingly, he could not have been denied tenure on "stigmatizing" grounds. Second, they contend, as mentioned above, that plaintiff was ordered to stop using the title MLKDP simply because he never held that title. Again, these allegations simply raise factual questions. Plaintiff's complaint, if taken as

true, complains of adverse action taken on the basis of the untrue charges that because he was an alcoholic he could not meet his teaching responsibilities. Further, he alleges that these charges were communicated to members of the faculty under circumstances unrelated to confidential or necessary discussions regarding his teaching competency. *Cf. Bishop v. Wood*, 426 U.S. 341, 348–49, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). Lastly, he contends that the challenge action has seriously damaged his employment opportunities.[5] Thus, while plaintiff may not be able to prove his charges, he has stated a claim that he has been deprived of liberty without due process of law.

## II. *The Rehabilitation Act Claim.*

Section 504 of The Rehabilitation Act of 1973, 29 U.S.C. § 794 provides:

No otherwise qualified handicapped individual in the United States, as defined in section 7(6) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.[6]

As noted at the outset, plaintiff admits that he is an alcoholic, but alleges that his alcoholism is under control and that it has not interfered with the successful performance of any of his assigned teaching responsibilities. Thus, characterizing his alcoholism as a "handicap," and himself as an "otherwise qualified handicapped individual," he alleges that the defendants in effect denied him tenure and prohibited him from using the MLKDP title solely because of his alcoholism and thereby violated § 504. The defendants, while not challenging plaintiff's characterization of his alcoholism[7] have moved to dismiss his claim on the ground that no private right of action exists by which an individual can seek redress for an alleged violation of section 504. Furthermore, they submit that even if such a private right of action does exist, plaintiff should be required to exhaust certain administrative remedies prior to bringing suit.[8] The American Council on Education has filed an amicus curiae brief in support of this position. The Department of Justice has filed an amicus brief on this point in which it joins in the plaintiff's contention that a private cause of action exists and

5. At the present time, plaintiff is admittedly employed by another university. While his reemployment might be evidence that the defendants' actions have not "imposed a . . . stigma . . . that [has] foreclosed his freedom to take advantage of other employment opportunities," as required by *Roth*, we do not believe that a discharged employee must remain permanently unemployed in order to prove a deprivation of a liberty interest. Moreover, plaintiff has alleged that the deprivation of his title will forestall opportunities to publish certain scholarly works. In any event, this question is one of fact and best left to the jury.

6. Section 7(6) of the Rehabilitation Act, 29 U.S.C. § 706(6) provides:

The term "handicapped individual" means any individual who (A) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (B) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter. For the purposes of subchapters IV and V of this chapter, such term means any person who (A) has a physical or mental impairment which substantially limits one or more of such per-

son's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment.

Section 504, 29 U.S.C. § 794 is contained in Subchapter V.

7. Indeed, it appears as if there would be no grounds upon which to base such a challenge. The Department of Health, Education, and Welfare, which pursuant to Executive Order 11914, 41 F.R. 17871 (1976), is charged, *inter alia*, with the duty of "establish[ing] standards for determining who are handicapped individuals" within the meaning of sections 7(6), 29 U.S.C. § 706, see note 6 *supra*, and 504, 29 U.S.C. § 794 of the Act, has concluded that alcoholics and drug addicts are protected by the Act's provisions. Analysis of Final H.E.W. Regulations implementing Section 504 (45 C.F.R. §§ 84.1–84.47), 42 F.R. 22677 (1977). *See also Davis v. Bucher*, 451 F.Supp. 791 (E.D.Pa.1978) (City's blanket refusal to hire former drug addicts violates section 504).

8. The defendants have also raised a number of other challenges to the section 504 claim. We find them meritless and therefore do not discuss them.

that this suit may be maintained without prior resort to administrative proceedings. We adopt this latter view.

In *Lloyd v. Regional Transp. Auth.*, 548 F.2d 1277 (7th Cir. 1977), the Seventh Circuit was confronted with a class action brought under section 504 by individuals who were confined to wheelchairs or were otherwise "mobility-disabled." The plaintiffs there sought to restrain the defendants, which were entities responsible for mass transit in the northeastern region of Illinois, from purchasing transportation equipment which would be inaccessible to members of the plaintiff class. After carefully reviewing the legislative history of the Act, and after analyzing section 504 against the standards laid down by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for determining whether a private cause of action is impliedly granted by a statute, the Court concluded that "it is plain that the rights of the handicapped [are] meant to be enforced at some point through the vehicle of a private cause of action." 548 F.2d at 1286. The court noted that section 504 confers affirmative rights upon handicapped individuals, *id.* at 1281, and that "[w]hen administrative remedial machinery does not exist to vindicate an affirmative right, there can be no objection to an independent cause of action in the federal courts," *id.* at 1286. Since *Lloyd*, every circuit court which has considered the question, including our own, has sustained the existence of a private cause of action under section 504. *See Davis v. Southeastern Community College*, 574 F.2d 1158 (4th Cir. 1978); *Leary v. Crapsey*, 566 F.2d 863 (2d Cir. 1977); *United Handicapped Federation v. Andre*, 558 F.2d 413 (8th Cir. 1977); *Kampmeier v. Nyquist*, 553 F.2d 296 (2d Cir. 1977).

Defendants point out, however, that since the time *Lloyd* was decided, the H.E.W., pursuant to Executive Order 11914, 41 F.R. 17871 (1976), has promulgated regulations designed to insure compliance with section 504, and that the existence of these regulations removed one of the underpinnings of the *Lloyd* decision.[9] That is, *Lloyd's* holding was premised on the unavailability of administrative remedies by which aggrieved parties could seek redress for violations of section 504, with the Seventh Circuit specifically noting that "assuming a meaningful administrative enforcement mechanism, the private cause of action under Section 504 should be limited to a *posteriori* judicial review." 548 F.2d at 1286 n. 29. Defendants argue that with the promulgation of these regulations, "a meaningful administrative enforcement mechanism" has been established and that such a mechanism is meant to be the exclusive means by which violations of section 504 are to be rectified. Aside from the fact that the Second Circuit in *Leary, supra*, sustained the existence of a private cause of action—admittedly without extensive discussion—after the regulations were promulgated, a review of those regulations reveals that they do not provide an effective means whereby an individual may vindicate his rights under section 504.

The regulations, which appear in 45 C.F.R. §§ 84.1–84.47, are designed to insure that recipients of federal funds do not violate the strictures of section 504. To that end, adopting in 45 C.F.R. § 84.61 those procedures utilized to assure compliance with Title VI of the Civil Rights Act of 1964 which are contained in 45 C.F.R. §§ 80.6–80.10 and Part 81, the regulations provide that the H.E.W. will, when learning of a possible section 504 violation, institute an investigation. If it is determined that a violation has occurred, voluntary compliance by way of remedial action will be sought. If these efforts at voluntary compliance are unsuccessful, the H.E.W., after a hearing, can cut off the federal funds which had been flowing to the transgressing institution.

This cutting off of funds is, effectively, the only sanction that H.E.W. can

---

9. At the time *Lloyd* was decided, the H.E.W. regulations concerning the enforcement of section 504, 45 C.F.R. §§ 84.1–84.47, had been proposed but not yet adopted.

impose.[10] Nowhere is the H.E.W. authorized to issue a binding order that damages be paid to an individual who has suffered by reason of a section 504 violation. Nor is the H.E.W. authorized to order the reinstatement of an individual who has been discharged in violation of that section.[11] Moreover, while an individual may file a complaint and thereby possibly trigger an H.E.W. investigation, he does not become a party to any proceedings between the H.E.W. and the alleged violator. 45 C.F.R. § 81.23. Indeed, the only relationship that he may have with these proceedings is the receipt of a notice that an administrative hearing is going to be held to determine whether funds should be cut off.[12] In short, while the administrative process may effectively provide, by way of the threat of a funding termination, an incentive to comply with section 504, it provides no means by which an individual can obtain personal redress for a section 504 violation. Thus, by their very terms, the regulations do not provide a "meaningful enforcement mechanism" for the vindication of personal rights. Moreover, as a practical matter, the H.E.W. itself, in an affidavit submitted with the Justice Department's amicus brief, has represented to the court that there is "a large backlog of [section 504] complaints and there is no guarantee that any newly filed complaint can be investigated and resolved in an expeditious manner."[13] Accordingly, since there clearly is still no effective administrative enforcement mechanism, we find no reason to distinguish the holding of *Lloyd* as it has been adopted in *Leary* and *Kampmeier*.

For essentially the same reasons, we reject the defendants' contention that exhaustion of the H.E.W. procedures is a necessary prerequisite to the institution of such an action. As the *Lloyd* court stated, "There being no administrative remedy open to th[is] plaintiff, neither the exhaustion nor

10. The regulations do provide that in the event of noncompliance,

> compliance . . . may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law. Such other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law. 45 C.F.R. § 80.8(a).

While the scope of these "other means authorized by law" is unclear, it does seem patent that the principal means of effecting compliance is through the threatened termination of Federal funding. This can be gleaned from the fact that the regulations simply provide no procedures by which any other sanctions may be imposed or judicially reviewed. In any event, and most pertinent to the issue before the court, we have not been presented with any information by the defendants indicating that any of the "other means" involve administrative remedies which handicapped individuals could turn to for personal redress.

11. Admittedly, the Regulations contemplate that in the event of a violation, remedial action will be required. 45 C.F.R. § 84.6. Such remedial action "includes . . . reinstatement of employees . . ." *Analysis of H.E.W. Regulations, supra* note 7, ¶ 9. However, it seems clear that the H.E.W. itself believes that it has no power to enforce an order for remedial action *per se* since the Agency's analysis of the regulations provide: "Should a recipient fail to take required remedial action, the ultimate sanctions of court action or termination of Federal financial assistance may be imposed." *Id.* As noted, above *see* note 10 *supra*, the nature of the contemplated "court action" is unclear, since there are no provisions for any judicial action other than the review of an agency determination to cut off funds. Suffice it to say, at the present time there is no "effective administrative enforcement mechanism" for the imposition of any sanction other than the termination of funds.

12. 45 C.F.R. § 81.23 does provide that a complainant "may petition, after proceedings are initiated, to become an amicus curiae." However, the regulations also provide that "the amicus curiae is not a party (to the proceeding) and may not introduce evidence at a hearing." 45 C.F.R. § 81.22(a).

13. The affidavit was prepared by Michael A. Middleton, Director, Division of Policy and Procedures, Office of Policy, Planning and Research, Office for Civil Rights, Department of Health, Education and Welfare. The Office of Civil Rights is responsible for the enforcement of section 504, and the Office of Policy, Planning and Research, is responsible for the development of policy under section 504.

primary jurisdiction doctrine applies." 548 F.2d at 1287, *citing Rosado v. Wyman*, 397 U.S. 397, 405–06, 90 S.Ct. 1207, 1214–15, 25 L.Ed.2d 442 (1970). *See also Simon v. St. Louis County*, C.A. 77–1140(c)(4) (E.D.Mo. Jan. 31, 1978); *Michigan Paralyzed Veterans of America v. Coleman*, 451 F.Supp. 7 (E.D.Mich.1977).

Admittedly, in *Doe v. New York University*, 442 F.Supp. 522 (S.D.N.Y.1978), the court did require a plaintiff bringing a section 504 action to first exhaust the H.E.W.'s administrative procedures. However, the basis of that court's decision was that because the H.E.W. regulations had been recently promulgated, "On paper, it now appears that, in the words of the Seventh Circuit in *Lloyd*, 'meaningful administrative enforcement' is available for complaints under section 504." *Id.* at 523. The court stated that "it is simply too early to find th[e] administrative remedy inadequate." *Id.* As we have noted, to the extent that the *Doe* court found that the promulgated regulations on their face provide an adequate remedy to vindicate individual rights, we disagree. Moreover, as a practical matter, the H.E.W. in its affidavit has stated that its handling of complaints is not efficient and that, as a matter of policy, it believes grievants should be entitled to institute suits without exhausting the Department's own complaint investigation procedures established pursuant to 45 C.F.R. § 80.7. Accordingly, we choose not to follow the holdings of *Doe* and other cases which have required exhaustion.[14]

III. *The Preliminary Injunction Motion.*

 Plaintiff has sought to preliminarily restrain the defendants from not treating him as a tenured member of the Brooklyn College faculty or from interfering with his use of the title MLKDP. Because the plaintiff, who left the Brooklyn College faculty after the institution of this suit and obtained a faculty position at another college, *see* note 5 *supra*, has not shown that he will suffer any harm that can be categorized as "irreparable," and because if is too

late to preserve the status quo ante, we find that the issuance of a preliminary injunction would be inappropriate. *See Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358–59 (2d Cir. 1976); *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Accordingly, the motion is denied.

*CONCLUSION*

The defendants' motion to dismiss the complaint and the plaintiff's motion for a preliminary injunction are denied and

IT IS SO ORDERED.

14. *See, e. g., Crawford v. University of North Carolina*, 440 F.Supp. 1047 (M.D.N.C.1977).