Clinton C. SIMPSON, Plaintiff-Appellant,

v.

REYNOLDS METALS COMPANY, INC.,
Defendant-Appellee.

No. 79–2110.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1980.

Decided Aug. 21, 1980.

Rehearing Denied Dec. 3, 1980.

Thomas Peters, Chicago, Ill, for plaintiff-appellant.

Michael W. Duffee, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, BAUER and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiff-appellant Clinton Simpson, who suffers from alcoholism, brought suit under §§ 504 and 503(a) of Title V of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 and 793(a), alleging his discharge by defendant Reynolds Metals Company ("Reynolds") resulted from discrimination against him because of his alcoholism and violated the affirmative action covenant in Reynolds' government procurement contracts. The district court granted defendant's motion to dismiss,[1] and Simpson appealed. We hold that to maintain an action for employment discrimination under § 504, a handicapped individual must be an intended beneficiary of the federal financial assistance received by his employer or must be able to show that the discrimination directed against him affected the beneficiaries of such aid. In addition, we hold that a private right of action may not be implied under § 503(a), which requires that government contracts contain affirmative action covenants in favor of handicapped individuals. Accordingly, we affirm.

## I.

Plaintiff Simpson was employed by Reynolds at its aluminum processing plant in

---

1. Since no statement of reasons has been provided, we do not have the benefit in our review of knowing on what grounds the district court granted Reynolds' motion to dismiss. After analyzing the various alternative bases for the ruling, we conclude that we must treat the judgment below as one rendered under Fed.R. Civ.P. 56 insofar as it dealt with plaintiff's claim under § 504 and as one issued under Fed.R.Civ.P. 12(b)(6) insofar as it addressed plaintiff's § 503 claim.

As to the § 504 claim, Reynolds had asserted three bases for its motion and had submitted affidavits supporting its contentions. Although defendant's motion was styled "motion to dismiss," and the district court judge specifically stated he was granting a motion to dismiss, we do not see how the court could have reached this result with respect to two of defendant's three arguments without relying on factual matter outside the complaint. While the court's order could conceivably have been based on defendant's third contention—an allegation of pleading insufficiency—we hesitate to ascribe that reason as the basis for dismissal because of the fairly liberal rules governing amendment of pleadings and because of our conclusion that the omission probably could have been cured. Since evidence outside the pleadings was not explicitly excluded by the court and most likely was relied upon in ruling on the § 504 claim, we must treat the order below as a grant of summary judgment on that count.

With respect to plaintiff's claim under § 503, we find that the district judge could have evaluated the arguments advanced by the parties without resort to factual matter outside the complaint. Accordingly, we will treat the ruling as to that count as an order to dismiss. In this connection, it is always helpful on appeal if the district court provides us with a statement of reasons for its holding.

McCook, Illinois from March 25, 1948, until July 27, 1977. Throughout much of his thirty-year tenure with the defendant, Simpson worked on the plant's "Hot Line," monitoring and, when necessary, regulating, the passage of molten metal along "hot roll tables."

Simpson admits he has a history of chronic alcoholism which is known to Reynolds and dates back to 1948. At defendant's suggestion, in late March 1976, Simpson was voluntarily hospitalized for four weeks at the Chicago Alcoholic Treatment Center. During that treatment period, plaintiff received standard sick pay from defendant. Plaintiff returned to his job in late April 1976, and worked without incident until September 27, 1976, when Reynolds suspended him without pay for missing three work days because of his drinking problem. Simpson's suspension lasted until April 13, 1977, when he was conditionally reinstated without back pay or benefits but also without loss of seniority. Among the conditions of his reinstatement were that plaintiff submit proof of regular attendance at Alcoholics Anonymous ("A.A.") meetings and that any future unexcused absence would be cause for dismissal.

Plaintiff was absent without excuse on July 24, 25, and 26, 1978. As a result, the company suspended him. Plaintiff admits that his absence was due to his alcoholism. Plaintiff appealed his suspension; he requested and received a hearing at which company and union representatives were present. Shortly thereafter, he was notified by letter that his appeal was denied and that he was discharged effective as of the date of his suspension.

Simpson brought suit alleging that Reynolds discharged him solely on account of his handicap of chronic alcoholism in violation of §§ 503(a) and 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 793, 794. Section 503(a) requires federal contractors to take affirmative action to employ and advance in employment qualified handicapped individuals.[2] Section 504 prohibits the exclusion of, denial of benefits to, or discrimination against handicapped persons under any program or activity receiving federal financial assistance.[3] Plaintiff added a pendent claim of handicap discrimination under Article I, Section 19 of the Illinois Constitution. In addition to declaratory relief, Simpson sought unspecified monetary damages and reinstatement with seniority and benefits to which he was entitled at the time of his discharge.

In his complaint, plaintiff asserted that his chronic alcoholism made him "a handicapped person, . . . having a combined physical and mental impairment substantially limiting his major life activity of earning a livelihood." He also alleged, however, that he was an " 'otherwise qualified' handicapped person in the . . . sense of being fully capable of performing the essential functions of his . . . job provided only that defendant took steps reasonably to accommodate and/or help overcome . . . [his] chronic alcoholism handicap." Plaintiff contended his alcoholism never interfered with his job performance for Reynolds. Plaintiff said that the duty not to discriminate was incumbent upon Reynolds as a "continuing recipient of

2. Section 503(a) provides in relevant part:

Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and non-personal services (including construction) for the United States shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals . . . . .

3. Section 504 provides in relevant part:

No otherwise qualified handicapped individual . . ., shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

various forms of federal assistance" and that Reynolds' responsibility to provide affirmative action assistance arose because of its status as a federal contractor.

Reynolds moved to dismiss the § 503 count of plaintiff's complaint on the ground that that section does not provide a private right of action. Reynolds also asserted three bases for dismissal of the § 504 claim. First, it contended the action must be dismissed since Reynolds does not receive any federal grants or financial assistance. While Reynolds admitted it contracted on several occasions with various federal agencies and departments for the procurement of goods and services, the company argued that this participation in procurement contracts did not constitute "assistance" within the meaning of § 504. Reynolds emphasized that at no time relevant to this litigation had its McCook, Illinois plant or any other of its facilities participated in any program which could be considered to involve the receipt of federal financial assistance. Reynolds stated that such abstention reflected a corporate policy established because of what it claimed are the onerous reporting requirements accompanying such federal assistance. Reynolds insisted that there have been no exceptions to this policy.

Reynolds did concede that it maintains certain apprenticeship or on-the-job training ("OJT") programs at its McCook plant but argued the programs, contrary to plaintiff's contentions, did not provide the company with any federal financial assistance. The employees hired for the program include both veterans and non-veterans. Although all such employees are paid identical salaries by Reynolds, the veterans in these apprenticeship programs may be able to receive additional benefits directly from the Veterans Administration ("VA"). Payment of the benefits is made to the veterans, and Reynolds contended it does not receive or accept any of the funds or otherwise act as a conduit between the agency and the beneficiaries. According to the company, these benefits do not affect the level of salary it pays to either the veterans or the non-veterans who participate in the apprenticeship training. Neither, Reynolds added, do the payments alter the costs of maintaining the program.

Second, Reynolds argued that its motion to dismiss the § 504 claim should be granted because plaintiff was not a beneficiary of any assistance arguably received by Reynolds. It is undisputed that plaintiff never participated in the apprenticeship program at the McCook plant. Neither did he allege that he was eligible to participate in the program or that he ever desired to participate in the program. As the third basis for its motion to dismiss the § 504 count, Reynolds contended Simpson failed to plead in his complaint that any such assistance allegedly received by Reynolds was primarily for the purpose of providing employment. Finally, Reynolds argued that in the event the district court dismissed plaintiff's federal claims, Simpson's pendent state law claim should be dismissed for want of a substantial federal claim to support jurisdiction over it.

The district court granted defendant's motion without giving reasons for its ruling. On appeal, the parties address the same arguments raised in the district court.

## II.

### A.

Implicit in plaintiff's argument on his § 504 claim is the assumption that this circuit in *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977), recognized that a private right of action may be implied under that section. This assumption by plaintiff, as well as by courts analyzing *Lloyd*,[4] may reflect an oversimplified view of that case and ignores the limitations we there expressed.

In *Lloyd*, we stated that a private right of action for declaratory and injunctive relief can be implied under § 504 on behalf of

---

4. *See, e. g., Leary v. Crapsey*, 566 F.2d 863, 865 (2d Cir. 1977); *United Handicapped Federation v. Andre*, 558 F.2d 413, 415 (8th Cir. 1977).

disabled persons who because of physical disabilities were unable to use federally funded mass transportation facilities. After deciding that § 504 conferred affirmative rights on the plaintiffs in that action, 548 F.2d at 1281, we held that, given the existence of only proposed interim regulations not yet published in final form by the Department of Health, Education and Welfare ("HEW"), an administrative remedy was not available for the plaintiff class. Hence, pending adoption of a meaningful administrative enforcement scheme, relief would be available only through a private judicial remedy. *Id.* at 1286–88. We expressly reserved the question whether a private right of action would still be available after final regulations were promulgated.[5]

. The final HEW regulations implementing § 504 and providing for administrative remedies have become effective since we issued our opinion in *Lloyd*; however, we need not address the question we reserved there because the apprenticeship program which plaintiff argues qualifies as "federal financial assistance" under § 504 is one implemented and funded not by HEW but by the VA which had not issued final regulations (but only proposed regulations) when the complaint in this action was filed. Under the terms of Executive Order 11,914, regulations issued by the VA are to govern enforcement of § 504 with regard to the apprenticeship program.[6] Given the unavailability of final VA regulations which may provide an administrative remedy, *Lloyd* would mandate a judicial remedy through a private action were it not for a more fundamental obstacle, which we now discuss, relating to Simpson's standing to assert a private right of action under § 504.[7]

---

**5.** In this regard, we stated:

> We expressly leave open as premature the question whether, after consolidated procedural enforcement regulations are issued to implement Section 504, the judicial remedy available must be limited to post-administrative remedy judicial review. In any event, the private cause of action we imply today must continue at least in the form of judicial review of administrative action. And until effective enforcement regulations are promulgated, Section 504 in its present incarnation as an independent cause of action should not be subjugated to the doctrine of exhaustion. . . . But assuming a meaningful administrative enforcement mechanism, the private cause of action under Section 504 should be limited to *a posteriori* judicial review. 548 F.2d at 1286 n.29.

**6.** Under § 1 of Executive Order No. 11,914, Appendix A to 45 C.F.R. Pt. 85 (1979), *reprinted in* 29 U.S.C. § 794 App., at 77 (1980), HEW was required to issue general standards for other departments and agencies to follow in drafting their regulations to implement § 504. The standards, which were published January 13, 1978, 43 Fed.Reg. 2132 (1978), set forth enforcement procedures and guidelines for determining what persons are handicapped and what practices are discriminatory. HEW's own regulations for enforcing § 504 in programs and activities receiving financial assistance from HEW became effective June 3, 1977. 42 Fed.Reg. 22676 (May 4, 1977).

Under § 2 of the Executive Order, each agency empowered to provide federal financial assistance was required to issue rules consistent with the overall HEW standards. In issuing its proposed regulations, the VA noted that some recipients of federal financial assistance would be subject to regulation by both the VA and HEW. To avoid possible duplication, the VA stated it anticipated a delegation of § 504 responsibility between the two agencies paralleling the division of responsibility then in effect between the two agencies with respect to Title VI of the Civil Rights Act of 1964 ("Title VI"). *See* 38 C.F.R. § 18a.1 (1979). Although the apprenticeship program involved in this case arguably has an educational component, it is not included among the veterans' programs for which HEW is to exercise § 504 responsibility. Thus, even though issuance of the HEW § 504 regulations predated Simpson's filing of this action, we do not believe they were applicable to his complaint.

**7.** As in *Lloyd*, pending promulgation of the final VA § 504 regulations and presentation to us of a complaint filed after their issuance, we expressly leave open the question whether a private cause of action under § 504 should be limited to judicial review of administrative proceedings.

In passing, we note that the Supreme Court has yet to express an opinion on whether a private right of action may be implied under § 504. Despite recent statements that it was planning to consider the implication question, *New York City Transit Authority v. Beazer*, 440 U.S. 568, 580 n.17, 99 S.Ct. 1355, 1363, 59 L.Ed.2d 587 (1979), it side-stepped the issue in *Southeastern Community College v. Davis*, 442 U.S. 397, 404-05 n.5, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979), by deciding that the plaintiff was not an "otherwise qualified handicapped individual" within the terms of Title V.

## B.

Section 504 makes it unlawful for otherwise qualified handicapped individuals[8] to "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" solely because of their handicaps. 29 U.S.C. § 794. Simpson has not contended that he ever sought to participate in or was denied admittance to the apprenticeship program. It is undisputed that he is not a veteran and that he, therefore, could not have been a participant in the program which he alleges constituted "federal financial assistance" to his employer. Neither has he demonstrated his allegedly discriminatory discharge denied him the benefits of the federal assistance in issue. Finally, he has not shown, as we doubt he could, since there was never any historical connection between his employment and the apprenticeship program, that he was "subjected to discrimination under any program or activity receiving Federal financial assistance." Even assuming that the OJT program qualifies as "federal financial assistance" under

We note, however, that the VA's proposed regulations implementing § 504 and HEW's final regulations on the subject adopt the Title VI enforcement procedures, 45 C.F.R. § 84.61 (1979), the same administrative mechanism used to enforce 20 U.S.C. § 1681 enacted as part of Title IX of the Education Amendments of 1972 ("Title IX"). See 45 C.F.R. § 86.71 (1979). In *Cannon v. University of Chicago*, 441 U.S. 677, 706–08 n.41, 99 S.Ct. 1946, 1962–1963, 60 L.Ed.2d 560 (1979), the Supreme Court held that a private cause of action should be implied under Title IX and, in rejecting the argument that individual court suits are inappropriate in advance of the exhaustion of administrative remedies, emphasized the inadequacies of the administrative procedures available for enforcement of Title IX.

Given the similarity of the Title V, Title VI, and Title IX enforcement procedures, we believe these same concerns over the absence of an effective administrative enforcement scheme would also apply to complaints under § 504 challenging discrimination in programs funded by HEW or the VA.

8. Plaintiff alleges in his complaint that he is an "otherwise qualified handicapped person," a jurisdictional prerequisite to suit under § 504. It is undisputed that during all times relevant to this suit plaintiff was an alcoholic. That fact in itself does not necessarily militate against our finding that he is an "otherwise qualified handicapped individual" nor defeat his standing under the Act. The definition of "handicapped individual" which was in effect as of the date his claim arose provided:

[S]uch term means any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major live activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment. 29 U.S.C. § 706(6) (1975).

Individuals with current problems or histories of alcoholism or drug abuse qualify as "handicapped individuals" under this definition unless their addiction or prior use can be shown to prevent successful performance of their jobs. *Davis v. Bucher*, 451 F.Supp. 791, 796–97 & n.4 (E.D.Pa.1978); Appendix A, 45 C.F.R. Pt. 84 at 379. *See Whitaker v. Board of Higher Education of the City of New York*, 461 F.Supp. 99, 106 & n.7 (E.D.N.Y.1978).

There are conflicting allegations in plaintiff's complaint as to whether or not his alcoholism prevented his successful performance of his work. At one point plaintiff avers that he was "fully capable of performing the essential function of his 'Hot Line' job provided only that Defendant took steps reasonably to accommodate [sic] and/or help overcome Plaintiff's chronic alcoholism handicap," yet shortly thereafter he notes that on the dates of his unexcused absence he "was in fact physically and mentally unable to work on account of a relapse of his chronic alcoholism and an attendant uncontrollable alcoholic drinking binge." In addition, he states that his "alcoholism never interfered with his actual performance for Defendant," and that during the period between his voluntary hospitalization and his first suspension in September 1976, he "missed fewer work days than his 'Hot Line' co-workers."

The record before us does not indicate that defendant attempted to develop a sufficient factual basis to refute plaintiff's claim that he qualifies as a "handicapped individual." Although we think it might have been possible to do so, defendant has not shown that plaintiff's alcoholism prevented his successful performance of his job. It is not clear on the record before us that plaintiff's absences exceeded his allowable sick leave or the leave limitations for non-alcoholic workers. Thus, viewing the facts in a light most favorable to plaintiff, we must conclude that plaintiff has standing under the Act as a "handicapped individual." Even if we were to apply the new definition adopted in 1978, our conclusion would be the same for that definition, effective November 6, 1978, merely codifies the interpretation adopted in the *Davis* case. *See* 29 U.S.C. § 706(7)(B) (1980).

the statute,[9] since plaintiff has not demonstrated any nexus between his discharge and the federal assistance, we find the district court's dismissal of his claim under § 504 should be affirmed.

■ The statute does not, as plaintiff seems to contend, generally forbid discrimination against the handicapped by recipients of federal assistance. Instead, its terms apparently require that the discrimination must have some direct or indirect effect on the handicapped persons in the program or activity receiving federal financial assistance. To be actionable, the discrimination must come in the operation of the program or manifest itself in a handicapped individual's exclusion from the program or a diminution of the benefits he would otherwise receive from the program.

The parties have not cited us to any discussion of § 504 in the legislative history which might shed further light on this issue. Neither has our research revealed any extensive consideration of the point in the committee reports which accompanied the adoption of § 504 in the Rehabilitation Act of 1973 and the further changes added by the Rehabilitation Act Amendments of 1974 and the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978. However, there is certainly nothing in the brief references to § 504 in the committee reports which precludes the restriction of recovery under the section to persons directly or indirectly benefiting from the federal financial assistance in question. In fact, these references support our interpretation that to be actionable the alleged discrimination must be in connection with a federally funded program or activity.[10]

Against the conclusion we reach, plaintiff also argues that one of the express purposes of the Rehabilitation Act of 1973 was to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and to place such individuals in employment." 29 U.S.C.

---

9. We do not decide at this time whether the OJT program qualifies as "federal financial assistance" under the statute.

10. The following excerpts are illustrative:

The Committee bill . . . prohibits discrimination against qualified handicapped individuals *under federal grants.* S.Rep.No. 318, 93d Cong., 1st Sess. 18, *reprinted in* [1973] U.S.Code Cong. & Admin.News, pp. 2076, 2091 (emphasis supplied).

The bill further includes a provision proclaiming a policy of nondiscrimination against otherwise qualified handicapped individuals *with respect to participation in or access to any program which is in receipt of Federal financial assistance. Id.* at 50, *reprinted in* [1973] U.S.Code Cong. & Admin. News at 2123 (emphasis supplied).

This section prohibits discriminatory exclusion or denial of benefits to otherwise qualified handicapped individuals *by any program or activity receiving Federal financial assistance. Id.* at 70, *reprinted in* [1973] U.S.Code Cong. & Admin.News at 2143 (emphasis supplied).

The section . . . constitutes the establishment of a broad government policy that *programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap[s]* S.Rep.No. 1297, 93d Cong., 2d Sess. 39, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6373, 6390 (emphasis supplied).

Only the following passage in the reports which accompanied enactment of the statute might conceivably be viewed as support for the proposition that § 504 imposes a general requirement upon recipients of federal assistance not to discriminate against employees whether or not they are involved in the assisted program:

Implementation of Section 504 would also include pre-grant analysis of recipients to ensure that federal funds are not initially provided to those who discriminate against handicapped individuals. S.Rep. 318, 93rd Cong. 1st Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News at 6390-91.

Obviously, any discrimination practiced by an employer prior to the receipt of federal monies could not have been in connection with a federally funded program or activity.

This statement, however, should be read as merely an expression of congressional intent not to fund institutions or employers who in the past discriminated against handicapped individuals. The isolated sentence is insufficient to compel us to conclude that Congress intended that under § 504 any discriminatory act against a handicapped individual by a recipient of federal financial assistance could be remedied through a private right of action regardless of whether the aggrieved individual was a beneficiary under the program. *But see Carmi v. Metropolitan St. Louis Sewer Dist.,* 620 F.2d 672, 677 (8th Cir. 1980) (McMillan, J., dissenting), discussed *infra,* at 1233-1235.

§ 701(8) (1975).[11] But he fails to read this statement together with the introductory language which precedes the enumerated list of statutory objectives, of which this statement is a part. When the statement is read with the introductory language, it is clear that Congress in adopting Title V intended *"to authorize programs* . . . to promote and expand employment activities." *Id.* (emphasis supplied). The full excerpt shows that Congress intended that the promotion and expansion of employ-ment opportunities come in connection with a federally funded program or activity. We fail to see how this section manifests an intent by Congress that § 504 impose a general requirement upon recipients of federal grants not to discriminate against handicapped employees who are not involved in a program or activity receiving such assistance.[12]

We find little consideration in reported cases of the question whether a private

11. In the 1978 amendments to the Act, Congress amended the declaration of policy to make it more concise. *See* H.R.Rep.No. 1149, 95th Cong., 2d Sess. 41, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 7312, 7352. *See also* H.R.Conf.Rep.No. 1780, 95th Cong., 2d Sess. 101, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 7375, 7412–13. The declaration now reads as follows:

The purpose of this chapter is to develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living. 29 U.S.C. § 701.

The specific aim of expansion of employment opportunities has been replaced by a guarantee of equal opportunity generally. We note, however, that the amendment makes clear that the purposes of the Act still are to be implemented through "comprehensive and coordinated *programs.*"

12. In arguing that to maintain an action under § 504 it is unnecessary that plaintiff be a direct beneficiary of the aid, Simpson asks us to embrace what he calls a "unified entity approach" in defining what constitutes "the program or activity receiving Federal financial assistance" in this case. Under plaintiff's theory, once some part of an entity becomes involved in a program or activity receiving federal financial assistance, the employment practices of the entire institution would be subject to the coverage of § 504. In support of his argument plaintiff relies on several cases in which the concept of a program or activity has been expanded to include an entire institution. *See Whitaker v. Board of Higher Education of the City of New York*, 461 F.Supp. 99 (E.D.N.Y.1978). *Cf. Flanagan v. President and Directors of Georgetown College*, 417 F.Supp. 377 (D.D.C.1976) (permitting private action under § 601, the analogous section of Title VI).

In *Whitaker* and *Flanagan*, the respective defendants had apparently relied on a very narrow, or "pin-point," approach to definition of the program or activity receiving federal financial assistance. The argument for the "pin-point" requirement is based on the language of § 602, 42 U.S.C. § 2000d–1, and § 3(c), Execu-tive Order 11,914, both of which provide that noncompliance with the relevant antidiscrimination provision may result in the termination of federal funding to programs or activities in which discrimination is found, but that such termination shall be limited to the particular program or part thereof with respect to which there has been a finding of noncompliance. In each case, the defendant apparently argued that the school's overall educational program was not the relevant "program or activity receiving Federal financial assistance," and hence receipt of funds by programs or activities other than plaintiff's did not support an action by plaintiff, whose own department or program was not federally funded. In neither *Whitaker* nor *Flanagan* did defendant prevail on this theory.

The court in *Whitaker* did not explain why it found defendant's argument "meritless." 461 F.Supp. at 106 n.8. In *Flanagan*, the court explained that the restriction on the power to terminate funding is designed to direct federal agencies that, in enforcing the antidiscrimination mandate, they are not to cut off all funds to an entire institution once discrimination is found but only to terminate aid to the particular program found to be discriminatory. But this restriction on the funding termination power is not a restriction limiting how a program or activity may be defined for purposes of bringing a private right of action.

We do not believe these cases support the application of a "unified entity approach" to the facts of the instant appeal. In *Whitaker* and *Flanagan*, the plaintiff had sought to participate in a privately funded program conducted in conjunction with an educational institution's overall program, other parts of which were federally funded. Without participation in the privately funded program plaintiff could not take part in the overall educational program which received federal funding. It is undisputed that the respective plaintiffs desired to participate in that overall program. Here, by contrast, there is no way in which defendant's allegedly discriminatory actions in its non-subsidized business prohibited plaintiff's participation in, or derivation of benefits from, a federally funded program.

right of action under § 504 to redress employment discrimination may be implied on behalf of individuals who are not the intended beneficiaries of the federal financial assistance in question. The few cases which address the issue are not illuminating.

Only two Courts of Appeals have been asked to consider claims of employment discrimination asserted by handicapped individuals under § 504. In *Carmi v. Metropolitan St. Louis Sewer District*, 620 F.2d 672 (8th Cir. 1980), and *Trageser v. Libbie Rehabilitation Center*, 590 F.2d 87, 89 (4th Cir. 1978), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979), both panels decided that the allegedly handicapped plaintiffs before them did not have standing to assert an employment discrimination claim because the primary objective of the federal financial assistance involved was not to provide employment.[13] Since we think it is fairly clear that the purpose of the aid alleged to constitute federal financial assistance in the instant case was to provide employment, we find the holdings in *Carmi* and *Trageser* inapplicable to our analysis. We do, however, find support for our result in *dicta* in both cases in which the respective panels noted that Title VI of the Civil Rights Act of 1964 ("Title VI"), upon which Title V is based, does not provide a private judicial remedy for employment discrimination by institutions receiving federal funds unless the allegedly discriminatory act causes discrimination against the primary or intended beneficiaries of the federal financial assistance. *Carmi v. Metropolitan St. Louis Sewer District*, 620 F.2d at 674-75; *Trageser v. Libbie Rehabilitation Center*, 590 F.2d at 89.

One district court recently relied on this *dictum* in *Trageser* to resolve a claim of employment discrimination in a case almost identical to the instant appeal in which the purpose of the federal financial assistance involved was clearly to provide employment. In *Proffitt v. Consolidated Coal Co.*, 21 F.E.P. Cases 382, 385 (S.D.W.V.1979), plaintiff failed to establish as a genuine issue of material fact that he was eligible to participate in the federally funded OJT program claimed to constitute federal financial assistance. Neither did plaintiff demonstrate that the discrimination allegedly directed at him affected applicants or participants in the OJT program. Without further discussion, the court dismissed plaintiff's § 504 claim.

One other district court opinion has evaluated standing to assert an employment discrimination claim under § 504 in terms of a plaintiff's status as a beneficiary under the federally funded program. In *Simon v. St. Louis County Police Department*, 14 F.E.P. Cases 1363 (E.D.Mo.1977), a handicapped applicant—rejected for a position as

---

13. As the basis for decision, both courts noted that in 1978, Congress added a provision to Title V which makes "[t]he remedies, procedures and rights set forth in Title VI . . . available to any persons aggrieved by any act . . . by a recipient of Federal assistance under § 504." 29 U.S.C. § 794a(a)(2). The panels concluded that by this amendment Congress intended to make the following restriction in § 604 of Title VI also apply to actions under § 504:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment*. 42 U.S.C. § 2000d-3 (emphasis supplied).

In both *Carmi* and *Trageser*, it apparently was undisputed that the purpose of the federal financial assistance was not to provide employment. Accordingly, the courts found the plaintiffs' complaints subject to dismissal because of the incorporation of § 604 in § 505(a)(2).

As noted earlier, Reynolds' third argument in support of its motion to dismiss was that Simpson had failed to plead specifically that the purpose of the alleged federal aid was to provide employment. Had the reason for the district court's ruling been traceable only to this allegation of pleading error, we would have difficulty affirming its dismissal of the complaint. We believe Simpson's allegation in the complaint that Reynolds received federal financial assistance was probably sufficient to apprise Reynolds of the grounds of plaintiff's claim. Since, however, we affirm on the more fundamental ground that plaintiff lacks standing to maintain this suit, we need not pursue this argument further.

a commissioned police officer—brought suit contending that the denial of his application constituted discrimination on the basis of handicap in violation of § 504. By defining the funded program or activity in a very narrow fashion, the court was able to preclude the plaintiff's recovery as a beneficiary. In dismissing the complaint, the court explained:

[T]he complaint does not allege that plaintiff was denied *all* employment by the Department, but, rather, that defendants refused to rehire him to his [former] position in the Department as a *commissioned police officer* "with reasonable accommodation for his paraplegia." In this situation plaintiff must allege that the *particular* job category in which he was allegedly discriminated [against] was a program or activity receiving federal financial assistance. 14 F.E.P. Cases at 1364 (emphasis in original) (footnote omitted).

But we find more persuasive the reasoning of opinions that have rejected this "pinpoint" approach to defining what constitutes "[a] program or activity receiving federal financial assistance." [14] We agree with the result in *Simon* only insofar as it stands

for the principle that private recovery under § 504 is restricted to intended beneficiaries of a federal program but disagree with its suggestion that definition of the program, and, therefore, the identification of the beneficiaries, is a matter very narrowly to be determined.

Section 504 was modeled after, and Congress intended that it be enforced in the same manner as, the antidiscrimination mandate of § 601 of Title VI.[15] Thus, the limitations on judicial enforcement of Title VI apply to private suits brought under § 504. As noted in *Carmi v. Metropolitan St. Louis Sewer District* and *Trageser v. Libbie Rehabilitation Center,* to bring a private action under § 601, the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program. *See N.A.A.C.P. v. Wilmington Medical Center, Inc.,* 599 F.2d 1247, 1252 (3d Cir. 1979); *Flora v. Moore,* 461 F.Supp. 1104, 1115 (N.D.Miss.1978).[16] The legislative history of Title VI also lends strong support to the conclusion that Congress did not intend to extend protection under Title VI to any person other than an intended beneficiary of federal financial assistance.[17]

14. *See, supra*, note 12.

15. Section 601 provides:
No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefit of or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d.

16. This principle is somewhat broadened in that some administrative actions indicate that the antidiscrimination provision of Title VI is applicable also to employment practices of recipients of federal financial assistance in situations where employment discrimination against non-beneficiaries affects the beneficiaries of the assistance. *See, e. g., Caulfield v. Board of Education of the City of New York,* 583 F.2d 605, 610–11 (2d Cir. 1978); *United States v. Jefferson County Board of Education,* 372 F.2d 836, 883 (5th Cir. 1966), *aff'd on rehearing,* 380 F.2d 385, *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed. 103 (1967); *United States v. El Camino Community College District,* 454 F.Supp. 825, 831 (C.D.Cal.1978), *aff'd,* 600 F.2d 1258 (9th Cir. 1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980); *United States v. Frazer,* 297 F.Supp. 319 (M.D.Ala.1968).

Although on the facts presented in the instant appeal, we cannot conceive of any way in which the alleged discrimination against Simpson affected the intended beneficiaries of the federal financial assistance, our holding should not be interpreted as foreclosing the possibility that in the future a handicapped individual, not himself involved in a federally funded program, may be able to recover if he can show that the discrimination against him somehow affected the intended beneficiaries of the assistance.

17. In response to concern voiced during debates on the Civil Rights Act of 1964 that Title VI would allow government intervention into every aspect of the operations of recipients of federal financial assistance, Representative Celler stated:
This title simply provides that, where Federal money is used to support any program or activity . . . the program must be used for the benefit of both races, without discrimination.

. . . . .

The bill would require that each federal agency which extends financial assistance of the type covered by Title VI must establish nondiscriminatory standards of general application.

Section 504 is also somewhat similar to the antidiscrimination provision in Title IX of the Education Act Amendments of 1972 ("Title IX"). That section provides in relevant part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . 20 U.S.C. § 1681(a).

To support its argument that Simpson may not bring suit under § 504 to remedy his alleged employment discrimination, defendant relies upon three recent cases that invalidated Title IX regulations prohibiting educational institutions from discriminating against *employees* because of their sex. These cases, *Romeo Community Schools v. HEW*, 600 F.2d 581 (6th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Junior College District of St. Louis v. Califano*, 597 F.2d 119 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); and *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979), held that § 901 was intended to protect students but not teachers from sex discrimination. These cases offer indirect support for the result we reach; however, we do not find them as compelling as the Title VI cases. The dif-

ferent language (for example, the express reference to "education") and the different legislative history of Title IX demonstrate more clearly than does the language and legislative history of § 504 exactly who are the beneficiaries of Title IX protection.[18]

■ Finally, plaintiff relies on regulations issued by the VA under Title VI to support an argument that federal assistance to one part of an employer's business thereby brings the entire business under the coverage of § 504. In particular, plaintiff relies on 38 C.F.R. § 18.3(b)(4) which provides for purposes of implementing Title VI:

As used in this section the services, financial aid or other benefits provided under a program receiving federal financial assistance shall be deemed to include any service, financial aid or other benefit provided in or through a *facility provided with* the aid of federal financial assistance (emphasis supplied).

Plaintiff argues that this regulation indicates that if a "facility" receives any financial assistance, every benefit or service provided by that facility becomes "federally assisted." This argument ignores the explanation of the phrase "provision of facilities" found in 38 C.F.R. § 18.13(g). That explanation makes it clear that a "facility provided with" federal assistance means one *constructed or physically remodeled with* federal assistance.[19] This interpreta-

---

. . . It would, in short, assure the existing right to equal treatment in the enjoyment of federal funds.

*as to each assisted program or activity, Title VI will require an identification of those persons whom Congress recorded as participants and beneficiaries and in respect to whom the principle declared in Title VI would apply.* 110 Cong.Rec. 1518–21 (emphasis supplied).

*See id.* at 1542 (remarks of Rep. Lindsay); *Id.* at 1602 (remarks of Rep. Mathias); *Id.* at 2480–81 (remarks of Rep. Ryan); *Id.* at 6545 (remarks of Sen. Humphrey); *Id.* at 7060 (remarks of Sen. Pastore) and *Id.* at 13380 (letter from Deputy Atty. Gen. Nicholas DeB. Katzenbach to Rep. Celler).

18. For instance, § 901 applies to "*education* program[s] or activit[ies] receiving Federal financial assistance," and the majority of the

exceptions to § 901 specifically refer to activities relating to students. At the time it was adopted, Congress also removed the exemption for educational institutions from Title VII, *see* Act of March 24, 1972, Pub.L. 92–261, § 3, 86 Stat. 103 (1972), and other related statutes intended to remedy private employment discrimination.

19. Section 18.13(g) provides in full:

The term "facility" includes all or any portion of structures, equipment, or other real or personal property or interests therein, *and the provision of facilities includes the construction, expansion, renovation, remodeling, alteration or acquisition of facilities* (emphasis supplied).

Our construction of the phrase "facility provided with" comports with the interpretation given to 45 C.F.R. § 80.3(b)(4), the analogous section in the HEW regulations issued under

tion of 38 C.F.R. § 18.3(b)(4) is supported by the analogous section in the regulations proposed by the VA to implement § 504. That section, which will be codified as 38 C.F.R. § 18d.4(b)(6) provides:

> As used in this section, the aid, benefit or service provided under a program or activity receiving or benefitting from Federal financial assistance includes any aid, benefit, or service *provided in or through a facility that has been constructed, expanded, altered, leased or rented, or otherwise acquired, in whole or in part, with Federal financial assistance* (emphasis supplied).

This proposed regulation actually includes an explanation of "facility provided with," and makes clear that the phrase refers to a structure built or remodeled with federal monies.[20] Thus, these regulations do not apply to defendant Reynolds' situation, since there has been no allegation that Reynolds' McCook plant was constructed with federal financial assistance.

### III.

In addition to his claim under § 504, plaintiff seeks to maintain his action against Reynolds under § 503(a) of the Rehabilitation Act, 29 U.S.C. § 793(a), based on what he alleges in his complaint was "Defendant's unexcused failure to institute and maintain workable, effective and realistic employer affirmative action programs to assist employee alcoholics . . . in the conditions of their employment."[21] As previously noted, defendant argued in its motion to dismiss plaintiff's complaint that

§ 503(a) does not afford a private right of action. The district court granted the motion, and we affirm.

Section 503(a) requires the inclusion, in any federal contract for an amount exceeding $2,500, of a provision requiring the contractor to "take affirmative action to employ and advance in employment qualified handicapped individuals" in the execution of the contract.[22] The Act requires the President to promulgate regulations implementing its provisions and also expressly provides an administrative remedy:

> If any handicapped individual believes any contractor has failed or refuses to comply with the provisions of his contract with the United States, relating to employment of handicapped individuals, such individual may file a complaint with the Department of Labor. The Department shall promptly investigate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto. 29 U.S.C. § 793(b).

The Department of Labor has promulgated an extensive set of regulations which provide, *inter alia*, for agency investigation, negotiation, conciliation, and, if necessary, judicial enforcement of agency sanctions. 41 C.F.R. Pt. 60–741 (1978).

Obviously, § 503 does not expressly provide for a private right of action. We must therefore determine whether or not such a remedy is implicit in the statute. In this task we are guided by the principles

---

Title VI. *See Flanagan v. President and Directors of Georgetown College,* 417 F.Supp. 377, 383 -84 (D.D.C.1976).

**20.** This proposed VA regulation is identical to a section of the HEW regulations implementing § 504. *See* 45 C.F.R. § 84.4(b)(6).

**21.** We emphasize that Simpson does not ask that we infer a private action to remedy alleged discrimination, in so many words, by a federal contractor as did plaintiff in the only other federal appellate decision to consider implication under § 503(a). *See Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1078 n. 3 (5th Cir. 1980). Simpson asks that we imply a private remedy to force compliance with the affirmative action

obligation created by § 503 and the implementing regulations. We think Simpson's claim is more directly related to § 503's principal thrust of ensuring that federal contractors take affirmative steps to employ the handicapped. This circumstance, in theory at least, makes our case closer than *Rogers*; however, as will appear, we do not find the distinction compels a different conclusion. In this connection we again note the comment in *Rogers* that, "there is no intimation that every qualified handicapped person has a right to affirmative action in his particular case." 611 F.2d at 1080.

**22.** *See, supra,* note 2.

announced in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975):

> In determining whether a private remedy is implicit in a statute not expressly Providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39 [36 S.Ct. 482, 484, 60 L.Ed. 874] (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? *See, e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 460 [94 S.Ct. 690, 693–694, 38 L.Ed.2d 646] (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? *See, e. g., Amtrak, supra*; *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423 [95 S.Ct. 1733, 1740, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey*, 379 U.S. 134 [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *See Wheeldin v. Wheeler*, 373 U.S. 647, 652 [83 S.Ct. 1441, 1445, 10 L.Ed.2d 605], (1963); cf. *J. I. Case Co. v. Borak*, 377 U.S. 426, 434 [84 S.Ct. 1555.1560, 12 L.Ed.2d 423] (1964); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 394–395 [91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 619] (1971); *id.*, at 400, [91 S.Ct. at 2006] (Harlan, J., concurring in judgment).

In *Cort*, applying this analysis, a unanimous Court held that a shareholder could *not* maintain a private action against corporate directors for alleged violations of 18 U.S.C. § 610, a criminal statute prohibiting corporations from making contributions or expenditures in connection with certain federal elections. The Court confirmed the continuing vitality of the *Cort* analysis in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), in which the Court evaluated Title IX—specifically § 901, 20 U.S.C. § 1681—and determined that all four factors favored implication of a private remedy in favor of women seeking admission to education programs receiving federal financial assistance.

In several cases subsequent to *Cannon*, the Court has come to emphasize that the four factors set forth in *Cort* are not necessarily entitled to equal weight. "What must ultimately be determined is whether Congress intended to create the private remedy asserted" and, consequently, the question is "basically a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche, Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). In fact in *Touche Ross*, when the analysis revealed that the statute in issue did not grant federal rights to any identifiable class and that the legislative history did not refer to private remedies, the court did not hesitate to end the inquiry without examination of the remaining two *Cort* factors. 442 U.S. at 576, 99 S.Ct. at 2489. After analyzing the language, legislative history and purpose of § 503, we conclude that Congress did not intend to create a private right of action to remedy violations of § 503 of the Rehabilitation Act. The Court of Appeals for the Fifth Circuit recently reached the same conclusion in *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074 (5th Cir. 1980).[23]

---

**23.** Because we agree with the Court of Appeals for the Fifth Circuit in *Rogers* that the fourth factor in *Cort* is satisfied—this is not a matter traditionally relegated to state law—we need not examine that factor in any detail. Since enactment of the Civil War Amendments, it has been clear that "the Federal Government and the federal courts have been the ' "*primary* and powerful relliances" ' in protecting citizens against . . . discrimination [of any sort]." *Cannon v. University of Chicago*, 441 U.S. at 708, 99 S.Ct. at 1963 (emphasis in original). Federal interest is even more obvious where, as here, the factor that triggers application of the statute is the existence of a contractual rela-

## A.

First, the threshold inquiry under *Cort v. Ash* is whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted' . . . That is, does the statute create a federal right in favor of the plaintiff?" 422 U.S. at 78, 95 S.Ct. at 2088. Recent Supreme Court decisions make clear that this question is answerable "by looking to the language of the statute itself," *Cannon v. University of Chicago,* 441 U.S. at 689, 99 S.Ct. at 1983; *see TAMA,* 444 U.S. at 16, 100 S.Ct. at 245; *Touche Ross,* 442 U.S. at 569–71, 99 S.Ct. at 2485--2486, and by paying attention to "the right—or duty-creating language of the statute [which] has generally been the most accurate indication of the propriety of implication of a cause of action." *Cannon v. University of Chicago,* 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13.

Virtually every district court to examine this issue, whether or not it ultimately determined that a private right of action should be implied under § 503, has easily

concluded that since handicapped individuals are the subjects of the affirmative action clauses mandated by § 503, the handicapped must be the class for whose especial benefit the statute was enacted.[24] We agree with the Court of Appeals for the Fifth Circuit that, in terms of the total analysis, this represents a much too facile approach and one which ignores that the *Cort* analysis requires that we ascertain whether Congress intended to " 'create a federal right in favor of the plaintiff'." *Rogers v. Frito-Lay, Inc.,* 611 F.2d at 1079, *quoting Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087.

By its terms, the language of § 503 does not manifestly endow with a private judicial remedy any handicapped individual who believes he has been harmed by a contractor's failure to meet his duty of affirmative action.[25] Rather, the language simply requires any federal department or agency contracting with a private employer to include an affirmative action covenant in the procurement or service contract.[26] As the

tionship between the federal government and defendant.

24. Even those district courts that have refused to imply a right of action under § 503 acknowledge that the statute was enacted to benefit handicapped persons. *Anderson v. Erie Lackawanna Ry. Co.,* 468 F.Supp. 934, 936 (N.D.Ohio 1979); *Wood v. Diamond State Tel. Co.,* 440 F.Supp. 1003, 1008 (D.Del.1977); *Rogers v. Frito-Lay, Inc.,* 433 F.Supp. 200, 202 (N.D.Tex. 1977), *aff'd,* 611 F.2d 1074 (5th Cir. 1980). *See Moon v. Roadway Express, Inc.,* 439 F.Supp. 1308 (N.D.Ga.1977), *aff'd sub nom. Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074 (5th Cir. 1980). The only other case to deny a private right of action under § 503, *Miglets v. Erie Lackawanna Ry. Co.,* 19 F.E.P. Cases 379 (N.D.Ohio 1979), did not explicitly address each *Cort* factor but instead adopted the reasoning in *Anderson v. Erie Lackawanna Ry. Co.*

Both *Hart v. County of Alameda,* 485 F.Supp. 66 (N.D.Cal.1979), and *Chaplin v. Consolidated Edison Co. of New York,* 482 F.Supp. 1165, 1168 (S.D.N.Y.1980), in reaching the conclusion that a private right of action should be implied under § 503, determined that handicapped persons were the class Congress intended to benefit. Neither *Drennon v. Philadelphia General Hospital,* 428 F.Supp. 809 (E.D.Pa.1977) nor *Duran v. City of Tampa,* 430 F.Supp. 75 (M.D. Fla.1977), the only other cases to grant a private remedy, clearly distinguishes its analysis

of § 503 from its analysis of § 504. *Duran* does not mention *Cort* and *Drennon* does not apply *Cort's* four factors in a routine manner.

25. *Compare* the ·language of § 503 *with* the following from § 401(n)(2) of the Federal Aviation Act, which in *Bratton v. Shiffrin,* No. 77–2037 (7th Cir. March 10, 1980), we found expressly conferred benefits on air charter travelers:

In order to protect travelers and shippers *by* aircraft operated by supplemental air carriers, the Board may require any supplemental air carrier to file a performance bond or equivalent security arrangement, in such amount and upon such terms as the Board shall prescribe, to be conditioned upon such supplemental air carrier's making appropriate compensation *to such travelers and shippers,* as prescribed by the Board, for failure on the part of such carrier to perform air transportation services in accordance with agreements therefor. 49 U.S.C. § 1371(n)(2) (emphasis supplied).

26. *Cf. Wood v. Diamond State Telephone Co.,* 440 F.Supp. 1003, 1009 (D.Del.1977) ("Section 793 [503] does not make discrimination against handicapped persons in the private sector illegal. Rather, it requires that an 'affirmative action' covenant which exceed the modest amount of $2,500.") *Accord, Moon v. Roadway Express, Inc.,* 439 F.Supp. 1308, 1309 (N.D.Ga.1977).

*Rogers* majority noted in its analysis of § 503,

> There is no intimation that every qualified handicapped person has a right to affirmative action in his particular case; what is apparent is that those who control federal contracts have a duty to make and enforce contracts containing the requisite clause. The handicapped may have simply the right to petition those who administer federal contracts to perform their duty. 611 F.2d at 1080.

The terms and structure of § 504 of the Rehabilitation Act are like the language of § 901 of Title IX and in other statutes which the Supreme Court in *Cannon v. University of Chicago* stated expressly identify the classes Congress intended to benefit. 441 U.S. at 690–92 & nn.12–13, 99 S.Ct. at 1954–1955. *See Lloyd v. Regional Transportation Authority*, 548 F.2d at 1285. Section 503 is not cast in the same mould. Rather, as the Court of Appeals for the Fifth Circuit has noted, there is a strong similarity between the language of § 503 and the wording which that Court of Appeals (quoting the Supreme Court) has said "would be sterile ground for implying a cause of action: '[t]here would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices.' " *Rogers v. Frito-Lay, Inc.*, 611 F.2d at 1080, quoting *Cannon v. University of Chicago*, 441 U.S. at 690–93 & n. 14, 99 S.Ct. at 1954–1955.[27]

While the language of § 503 identifies a particular class to be benefited (in contrast to criminal statutes, such as the one construed in *Cort*, and other laws enacted for the protection of the general public), the lack of the duty-creating language in § 503 makes implication of a private judicial remedy difficult. The structure of § 503 removes this case from the species of analysis pursued in *Cannon*, where the situation was "one 'in which it is [so] clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to *deny* such cause of action would be controlling.' *Cort*, 422 U.S. at 82 [95 S.Ct. at 2089] (emphasis in original)." *Cannon v. University of Chicago*, 441 U.S. at 694, 99 S.Ct. at 1956 (footnote omitted).

### B.

In trying to discern a legislative intent to create or deny a private cause of action under § 503, we begin with plaintiff's concession that the legislative history of § 503 is silent on whether during the process of enactment Congress contemplated a private judicial remedy for handicapped persons.[28] The Rehabilitation Act, as passed in 1973, created new federal rehabilitation programs for the handicapped "to be more responsive to the needs of the handicapped individual by providing a better basic program of service . . . . [and] to focus research and training activities on making employment and participation in society more feasible

---

**27.** *But see McDaniel v. University of Chicago*, 548 F.2d 689, 692–93 (7th Cir. 1977), *cert. denied*, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978), in which, without the guidance of the Supreme Court's pronouncements in *Cannon v. University of Chicago*, we found plaintiff-laborers were the "especial" beneficiaries of § 1 of the Davis-Bacon Act, 40 U.S.C. § 276a. ("The advertised specifications for every contract in excess of $2,000, to which the United States . . . is a party, for construction . . . of public buildings . . . shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics . . . .")

**28.** By contrast, note that the Supreme Court in *Cannon v. University of Chicago*, 441 U.S. at 694, 99 S.Ct. at 1956, found that "the history of Title IX rather plainly indicates that Congress intended to create such a remedy."

Even Judge Goldberg, dissenting in *Rogers v. Frito-Lay* in favor of an implied right of action stated "[s]uch discussion as did take place is of little aid in ascertaining whether Congress contemplated a private right of action under § 503." 611 F.2d at 1094 (Goldberg, J., dissenting).

for handicapped individuals." S.Rep. No. 318, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Admin.News, pp. 2076, 2092. The discussion and debates in the congressional materials focused on the appropriations necessary to implement these programs and virtually ignored the import of §§ 503 and 504, which were contained in a section captioned "Title V—Miscellaneous Provisions."

The legislative histories of two subsequent amendments to the Rehabilitation Act provide no explicit discussion of the question before us and do not provide any statements which can be read as dispositive of congressional intent on the issue of implication. In 1974, Congress amended the definition of "handicapped person" applicable to §§ 503 and 504. In recommending passage of the Rehabilitation Act Amendments of 1974, the Senate Labor and Public Welfare Committee noted:

> Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d–1 (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 [sic] (relating to sex). The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap. . . .
>
> The language of section 504, in followig [sic] the above-cited Acts, further envisions the implementation of a compliance program which is similar to those Acts, . . . .. This approach to implementation of section 504, which closely follows the models of the above-cited anti-discrimination provisions, would ensure administrative due process (right to hear-

ing, right to review), provide for administrative consistency within the Federal government as well as relative ease of implementation, and *permit a judicial remedy through a private action.* S.Rep. No. 1297, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6373, 6390–91 (emphasis supplied).

The Committee proceeded to suggest "that sections 503 and 504 be administered in such a manner that a consistent, uniform, and effective Federal approach to discrimination against handicapped persons would result." *Id.* at 6391. While one court has relied on this emphasis on uniformity to conclude that Congress also contemplated that a private remedy be available to enforce § 503, *Hart v. County of Alameda*, 485 F.Supp. 66, 73 (N.D.Cal.1979), the context belies this interpretation of the Committee statement. The language following the discussion of uniformity states:

> Thus, Federal agencies and departments should cooperate in developing standards and policies so that there is a uniform, consistent Federal approach to these sections. [1974] U.S.Code Cong. & Admin. News at 6391.

The Committee proceeds to instruct the Departments of Labor and Health, Education and Welfare to coordinate their efforts in enforcing §§ 503 and 504. *Id.* "[T]he command that sections 503 and 504 be administered uniformly may only indicate Congress' concern with the potential for conflicting regulations promulgated by the different agencies responsible for enforcing the statute, and is not conclusive on the question whether Congress intended to create or deny a private right of action under § 503(a)." *Chaplin v. Consolidated Edison Co. of New York, Inc.*, 482 F.Supp. 1165, 1170 (S.D.N.Y.1980).[29]

As a major part of his argument on the second *Cort* factor, plaintiff relies on the

---

**29.** During floor debate on the consistency issue, Senator Stafford, who was not a conferee on the bill but was ranking minority member of the Subcommittee on the Handicapped of the Committee on Labor and Public Welfare, spoke concerning the parallel between §§ 503 and 504:

> As the Senators are aware, the sections I have just cited establish Federal Government

policies as they relate to programs receiving Federal financial assistance and the prohibition against discrimination on any basis. It was the committee's intent that the enforcement under sections 503 and 504 would be similar to that carried out under section 601 of the Civil Rights Act and 901 of the Education Amendments [sic] of 1972.

legislative history accompanying passage of the 1978 amendments, in which Congress made provision for attorney's fees for successful Rehabilitation Act litigants. The amendments added a new provision, § 505, 29 U.S.C. § 794a, which in relevant part provides:

In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the cost.

Plaintiff asks that we draw from this amendment the inference that Congress originally understood § 503 to confer a private right of action.

This argument, though beguiling, falls short. By its terms, "[t]his [provision] authorizes an attorney's fee in actions brought to enforce section 503; but it does not necessarily follow that the amendment is intended to authorize private individuals to file civil actions under that section." *Rogers v. Frito-Lay, Inc.*, 611 F.2d at 1082. The reference to an "action or proceeding" may signify those actions or proceedings brought under § 503(b), which directs aggrieved handicapped persons to initiate actions at the Department of Labor. The Department of Labor regulations provide for judicial consideration of an administrative decision, 41 C.F.R. § 60.741.28(b) (1979), with respect to which Congress might have intended the possible award of an attorney's fee.

We are aware that as originally introduced in the House, the attorney's fee bill specifically listed § 503 as one of the sections covered by the fee provision,[30] and that, in explaining a subsequent substitution of the more general reference to Title V, the Senate report states:

Subsection (b) of section 505 provides for the allowance by a court, in its discretion, of reasonable attorney's fees as part of costs to the prevailing party, other than the United States. The committee believes that the rights extended to handicapped individuals under Title V that is, Federal Government employment, physical accessibility in public buildings, *employment under Federal contracts*, and nondiscrimination under Federal Grants —are, and will remain, in need of constant vigilance by handicapped individuals to assure compliance, and the availability of attorney's fees should assist in vindicating private rights of action in the case of *section 502 and 503 cases*, as well as those arising under section 501 and 504. S.Rep. No. 890, 95th Cong., 2d Sess. 19 (1978) (emphasis supplied).

We are also aware of various comments made during floor debates concerning the need to make private rights of action under Title V "meaningful" by the provision of an attorney's fee.[31]

With the exception of the language from the Senate report, we find all these excerpts from the legislative history ambiguous in their reference to § 503. More importantly, as the Supreme Court noted in rejecting an almost identical argument in *Cannon v. University of Chicago* premised

---

I cannot stress strongly enough the need for strong enforcement of sections 503 and 504 . . . . . 120 Cong.Rec. 30551 (1974).

While suggestive of an implied private right of action under § 503, this statement is far from an explicit declaration on that point since it is not inconceivable that Senator Stafford is referring to administrative "enforcement." In any event, Senator Stafford, although distinguished and knowledgeable, is not the Committee, the Senate or the Congress.

30. As first introduced in the House. H.R. 12467 provided:

In any action or proceeding to enforce any provision of section 501, *section 503*, or section 504, the court may allow any prevailing party . . . a reasonable attorneys' fee

as part of the costs. 124 Cong.Rec. H 3961 (daily ed., May 16, 1978) (emphasis supplied).

31. In this regard, *see, e. g.*, 124 Cong.Rec. 15590–91 (1978) (remarks of Sen. Cranston); *Id.* at 15593 (1978) (remarks of Sen. Bayh); and *Id.* at 18999–19000 (1978) (remarks of Sen. Stafford). We note that all these comments refer not to § 503 specifically but refer to private enforcement of Title V. As is true of the language of § 505(b) itself, these statements could be interpreted to mean that Congress had intended to create private rights of action in sections of Title V other than § 503(a). For instance, these statements may refer to an implied right of action under § 504, which at the time of the debates had already received judicial recognition and approval.

upon Congress' adoption of an attorney's fee provision four years subsequent to its adoption of Title IX, "we would be remiss if we ignored these authoritative expressions concerning the scope and purpose" of the Title, but "we cannot accord these remarks the weight of contemporary legislative history." 441 U.S. at 686–87 n.7, 99 S.Ct. at 1952.

We are left without any indication that, contemporaneous with its adoption of § 503, Congress intended to extend a private remedy to handicapped individuals allegedly harmed by their employer's failure to comply with his affirmative action obligation as a federal contractor. At most, we are faced with an assumption on the part of a legislative committee in 1978 that five years earlier the Congress had created a private right of action to enforce § 503. Such an assumption cannot be relied upon as a faithful indicator of prior congressional intent. In *Cannon v. University of Chicago*, 441 U.S. at 694–703, 99 S.Ct. at 1956–1960, the Supreme Court noted that the legislative drafters of Title IX intended that it be enforced in the same manner as Title VI, and, in recognizing a private remedy under Title IX, the Court relied upon an assumed awareness by legislators at the time they adopted Title IX that a private right of action had already been recognized under Title VI. This assumption of intent contemporaneous with enactment is far different from the "retroactive" assumption plaintiff asks us to adopt.[32]

We note, however, that the Supreme Court, when confronted in similar circumstances with a completely blank legislative slate, "has held that the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such remedy available. . . . Such intent may appear implicitly in the language or the structure of the statute, or in the circumstances of its enactment." *TAMA*, 444 U.S. at 18, 100 S.Ct. at 246. Accordingly, we turn to an examination of the third analytical step established by *Cort.*

### C.

In contrast to § 504 and Title IX, § 503(b) provides an express administrative remedy for a handicapped individual who believes he has been injured by a contractor's failure to comply with § 503(a) and the regulations implementing that section. This fact insofar as it discloses the underlying purposes of the legislative scheme suggests that the implication of a private right in favor of Simpson, would be inconsistent with the scheme.

However, with respect to this third element of the *Cort* analysis, the Supreme Court has recently stated:

> [A] private remedy should not be implied if it would frustrate the underlying purpose of the legislative scheme. On the other hand, when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute. *Cannon v. University of Chicago*, 441 U.S. at 703, 99 S.Ct. at 1961.

---

**32.** In asking that we find a legislative intent to deny a private remedy under § 503, defendant has presented us with one additional argument. The 1978 amendments, Reynolds states, specifically made available the "remedies, procedures, and rights" contained in Title VII for violations of § 501, 29 U.S.C. § 791, which requires federal agencies to implement affirmative action plans for their employment of handicapped individuals. This provision, defendant argues, evidences a congressional view that the making available of the remedies of Title VII was not needed in the case of § 503. But such an omission certainly cannot be said to represent denial of a private remedy. "The fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section." *Cannon v. University of Chicago*, 441 U.S. at 711, 99 S.Ct. at 1965.

We also decline to attach great significance to the fact that Congress has so far refused to amend Title VII to protect handicapped individuals from employment discrimination. Title VII reaches all employers, both private and public, of any significant size, see 42 U.S.C. § 2000e(b), whereas § 503 affects only those employers who contract with the federal government. We find nothing inconsistent in Congress' affording handicapped persons protection from the practices of the latter while declining to extend coverage to the former.

In concluding that the third factor favored implication in *Cannon*, the Court relied upon the expressed opinion of the agency charged with the implementation of Title IX that there was no inconsistency between an administrative remedy and a private remedy. Apparently, the Office of Federal Contract Compliance Programs of the Department of Labor, which is charged with enforcement of § 503, made similar representations in *Chaplin v. Consolidated Edison Co. of New York, Inc.*, 482 F.Supp. at 1172, and copies of those statements were made available to the Court of Appeals for the Fifth Circuit in *Rogers v. Frito-Lay, Inc. See* Appendix—Affidavit of Weldon · J. Rougeau, 611 F.2d at 1108–09. The dissent in *Rogers* found this administrative opinion determinative of the third factor. 611 F.2d at 1103–05 (Goldberg, J., dissenting).

But the record here contains no similar statement about a need to imply a private right of action to compensate for inadequate agency resources available for enforcement of § 503. Even were we presented with such information, we would not necessarily be compelled to imply a private remedy on that basis. We would still be confronted by the explicit congressional intent, evidenced by the terms of § 503(b), to address the problems of the handicapped through administrative means.[33]

In light of our evaluation of all the factors enunciated in *Cort v. Ash*, we find that § 503 does not authorize by implication a private right of action on behalf of Simpson. We believe from our examination of the terms of § 503 that Congress did not intend to create a federal right in his favor. More importantly, we can find no extrinsic evidence of congressional intent, contemporaneous with passage of the section, to create a private remedy nor have we discover-

ed any subsequent persuasive indication that it has ever been the intent of the Congress to create a private judicial remedy. Neither do we believe that implication is essential to achieving the objectives of the statute. Congress apparently intended the filing of a complaint with the Department of Labor to be the appropriate means for a private individual to enforce the contractual obligations created by § 503(a). Our task here is to carry out the intent of Congress not to substitute our judgment as to appropriate remedies. Accordingly, we affirm the dismissal by the district court of plaintiff's cause of action premised both on § 504 and on § 503.[34]

AFFIRMED.

---

**33.** We also find some support for our conclusion on the third factor from one additional comparison of the legislative schemes of Titles IX and V which was made by the Court of Appeals for the Fifth Circuit in *Rogers v. Frito-Lay, Inc.*:

Title IX contained a provision for the award of attorney's fees, passed contemporaneously with the act, which indicated that the very Congress that passed the law believed a pri-

vate cause of action existed. No corresponding reason exists to buttress the thesis that section 503 was intended to authorize private litigation. 611 F.2d at 1084.

**34.** Given our dismissal of the federal claims, we are without jurisdiction to consider plaintiff's state law claims. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).